FILED

12/20/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 14, 2018 Session

## STATE OF TENNESSEE v. CORAY EUGENE KNIGHT

**Appeal from the Circuit Court for Montgomery County**
**No. 41301230      Mark J. Fishburn, Judge**

_____

**No. M2017-01584-CCA-R3-CD**

_____

In November 2013, a Montgomery County grand jury returned a ten-count indictment against the defendant, Coray Eugene Knight, and his two co-defendants, Kelley Hufford and Frederick Persinger, charging them with conspiracy to commit first degree murder, first degree premeditated murder, first degree felony murder, two counts of especially aggravated kidnapping, three counts of aggravated kidnapping, abuse of a corpse, and tampering with evidence. A jury convicted the defendant as charged on all counts and he received an effective life sentence. On appeal, the defendant challenges the sufficiency of the evidence supporting his conviction for first degree premeditated murder. He also challenges the jurisdiction of the trial court and several of its rulings, including: the denial of his motion to suppress the statements he made prior to trial; the ruling finding Mr. Persinger competent to testify at trial; the denial of his motions for a mistrial, for judgment of acquittal, and for a new trial; and the denial of his request for a jury instruction on the defense of others. Based upon our review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Stephanie Ritchie Mize, Clarksville, Tennessee, for the appellant, Coray Eugene Knight.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Helen O. Young, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Facts and Procedural History*

Over the course of two days in May 2013, the defendant and his two co-defendants planned and executed the murder of their victim, Jimmy Boyer. At issue in this appeal are the crimes committed against the victim on May 17 and 18, 2013, beginning in Christian County, Kentucky and ending in Montgomery County, Tennessee. Specifically, after conspiring with Kelley Hufford and Frederick "Frank" Persinger on May 17, 2013, the defendant beat the victim, shot him, and then burned his body in the early morning hours of May 18, 2013. During the pending investigation into the victim's death, the defendant gave a statement to Detectives Eric Ewing and Michael Ulrey of the Clarksville Police Department, after which he was arrested. While incarcerated, the defendant confided in Todd Eric Lundy, a fellow inmate at the Montgomery County Detention Center who wrote letters to Detective Ewing detailing the conversations he had with the defendant while in jail. The trial court denied the defendant's motion to suppress the statements he made to Mr. Lundy and to Detectives Ewing and Ulrey. As such, the defendant proceeded to trial for conspiracy to commit first degree murder (count one), first degree premeditated murder (count two), first degree felony murder (count three), two counts of especially aggravated kidnapping (counts four and five), three counts of aggravated kidnapping (counts six, seven, and eight), abuse of a corpse (count nine), and tampering with evidence (count ten).

## I. *Motion to Suppress Hearing*

The trial court conducted a hearing on the defendant's motion to suppress the statements he made both before and after his arrest. The first statement challenged by the defendant resulted from his initial interrogation by Detectives Ewing and Ulrey of the Clarksville Police Department on May 29, 2013. The defendant also challenged the statements he made to Todd Eric Lundy while both were incarcerated at the Montgomery County Detention Center. In his motion to suppress, the defendant argued the statements he made to the detectives and to Mr. Lundy "and the fruits thereof are inadmissible, illegal, and taken in violation of" his constitutional rights. The defendant further alleged "he was denied his right to counsel" during both his interview with the detectives and his discussions with Mr. Lundy, asserting Mr. Lundy acted as a confidential informant for the police. The State disagreed and presented evidence regarding the constitutionality and admissibility of the defendant's statements at the suppression hearing.

Detective Ewing, the lead investigator into the victim's murder, spoke with Ms. Hufford, the victim's girlfriend, in the days immediately following the victim's death. During one of their initial discussions, Ms. Hufford claimed she planned to meet the defendant at a bar on the night of the murder. As a result, Detective Ewing contacted the defendant on May 21, 2013, to confirm Ms. Hufford's alibi. Detective Ewing noted the defendant was not a suspect at the time. However, as his investigation progressed,

Detective Ewing identified the defendant, Ms. Hufford, and Mr. Persinger as suspects. Specifically, after obtaining a search warrant for Ms. Hufford's cell phone, Detective Ewing found "suspicious text messages . . . sent between [the defendant], [Ms.] Hufford and [Mr.] Persinger." Detective Ewing then called the defendant at 11:48 p.m. on May 28, 2013, stating he needed to speak with him regarding the victim's death. The defendant complied and arrived at the police station around 12:15 a.m.

Before speaking with the defendant, Detective Ewing presented him with a *Miranda* waiver form, advised the defendant of his *Miranda* rights, and ensured the defendant's understanding of the same.[1] Detective Ewing stated "[the defendant] did not give me any indication that he did not understand" his rights and the defendant did not request an attorney. Detective Ewing then began the interview.

He described the defendant as "[k]ind of controlling and manipulating in a way" during the interview but "successful in communicating his point." The defendant claimed he was at a bar, Sunny's Lounge, on the night of the murder. Though the defendant mentioned he was tired multiple times, Detective Ewing stated "it didn't seem to be a plea to stop or a -- an indication that he was unable to continue." Throughout the interview, Detective Ewing made accommodations for the defendant, allowing him numerous smoke breaks and attempting to verify his alibi by calling Sunny's Lounge. After approximately one hour and forty-five minutes, Detective Ulrey took over the interview.

Detective Ulrey described his interview with the defendant as "very cordial," stating he also tried to accommodate the defendant by allowing him smoke breaks and permitting him to call his daughter's mother. During the interview, the defendant asked Detective Ulrey what would happen if he requested an attorney. The following exchange occurred:

[The defendant]: Hmm. And at this moment I say -- if I say I want an attorney?

Detective Ulrey: Then I'll walk out.

[The defendant]: Then what? We go straight to booking?

Detective Ulrey: Well, we'll -- I mean, that won't speed time up, it won't speed your warrant up, it won't speed anything like that. Don't think that

---

[1]*See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

me sitting in here -- here with you right now is delaying anything, 'cuz it's not. They're (inaudible) --

[The defendant]: No. I'm just saying.

Detective Ulrey: Right. Uh, I mean, all it'll -- only thing it'll accomplish is for me to walk out. That's it.

[The defendant]: So based on that it's tell you what you wanna know or ask for attorney for advice, and you walk out and then pretty much I'm screwed either way it goes. Talk to the police or not.

Detective Ulrey: I think you're screwed, period. Okay. I think you're screwed, period. Whether you want to give me the rest of the story to screw other people involved is up to you. If you wanna sit here and tell me you wanna talk to an attorney, I'm -- I'm for that. That -- that's absolute -- that's your constitutional right that people have fought and died for over the years, and I respect it, and I'll walk out. Is it what I wanna hear? Of course not. Okay. Because I don't -- I don't like f***** leavin s*** out there. Okay. But if you tell me you wanna talk to an attorney, I'm -- I'm gone. And I'm not gonna treat you any different; I'm not gonna cold shoulder you or give you scouring looks or nothin like that. It just is what it is. I'm not that guy.

The defendant continued talking and consequently, Detective Ulrey did not believe he invoked his right to counsel during the interview.

At one point, Detective Ulrey "scooted" towards the defendant who was handcuffed to the wall. Detective Ulrey explained his movements were not meant to intimidate the defendant and he did not "believe [the defendant] was intimidated by [him]." According to Detective Ulrey, the defendant was coherent for the duration of the interview and even expressed gratitude towards him "[o]n multiple occasions." The entire interview, which was recorded and transcribed, along with the defendant's signed *Miranda* waiver, was entered into evidence.

The State also introduced into evidence seven letters written by Todd Eric Lundy. On August 6, 2013, Mr. Lundy wrote to the Clarksville Police Department stating he had information that would help the investigation into the victim's murder. On August 8, 2013, Mr. Lundy wrote directly to Detective Ewing. In the letter, he stated the defendant told him details regarding "why the woman wanted the victim killed[,] where they took the body[,] and how they tried to dispose of the body." Mr. Lundy sent another letter to

- 4 -

Detective Ewing on August 12, 2013, wherein he explained the defendant provided more details "such as where the victim was actually killed, where they cut the body up, what they used to cut the body, who all was present when the murder occurred, how much was paid, information about [a] co-defendant, information about where and who burned evidence and more." On August 19, 2013, Mr. Lundy again wrote Detective Ewing providing a list of new information the defendant told him about the murder. Additionally, Mr. Lundy included that the defendant asked him "about killing the female co-defendant once [he's] out for money." In a letter dated August 26, 2013, Mr. Lundy stated he had additional information about the victim's murder, including personal details about the defendant, "the female co-defendant and her family," and "the victim and his family." Mr. Lundy also provided a summary of the facts he learned from the defendant thus far. Mr. Lundy sent two follow-up letters on September 2 and 5, 2013, requesting relief from Detective Ewing and indicating his willingness to cooperate with the investigation.

The State recalled Detective Ewing to describe his interactions with Mr. Lundy as they related to the defendant's statements made while in jail. As detailed above, Detective Ewing received the initial letter from Mr. Lundy on August 6, 2013. In the letter, Mr. Lundy indicated he spoke with the defendant through their jail cells and he had information regarding the victim's death.

On August 9, 2013, Detective Ewing conducted a recorded interview with Mr. Lundy to discuss the information presented in the letters about the victim's death and the defendant's involvement in the same.[2] Mr. Lundy sought relief on his own charges in exchange for the information he provided to Detective Ewing. During the interview, however, Detective Ewing made clear Mr. Lundy "could not work for [him]" because he "didn't want to make [Mr. Lundy] an agent of the state." As such, Detective Ewing did nothing to facilitate the relationship between Mr. Lundy and the defendant while the two remained incarcerated.

Detective Ewing acknowledged portions of the information provided by Mr. Lundy during his interview on August 9, 2013, were wrong. For example, Mr. Lundy incorrectly stated the defendant cut the victim's body with electric tools. Though Mr. Lundy provided some inaccurate details, Detective Ewing considered him to be a reliable source and attributed the incorrect information to "jailhouse posturing and . . . braggadocio."

In the August 19 and 26, 2013 letters, Mr. Lundy "indicated that [the defendant] was attempting to hire [Mr. Lundy] to murder his [c]o[-]defendant[,] Kelley Hufford."

---

[2]Mr. Lundy also provided a written statement at this time.

As a result, Detective Ewing again interviewed Mr. Lundy, and Mr. Lundy provided another written statement on August 28, 2013. Mr. Lundy's second statement, however, did not include information about the alleged murder for hire of Ms. Hufford as it was "a separate matter, a separate investigation." Instead, Mr. Lundy agreed to wear a wire "[t]o try and obtain details and information in reference to a murder for hire plot" and he successfully recorded a conversation with the defendant on August 30, 2013. During the recorded conversation, the defendant solicited Mr. Lundy to murder Ms. Hufford. The State entered a copy of the transcript and recording of the August 30, 2013 conversation into evidence.

In outfitting Mr. Lundy with a wire, Detective Ewing instructed him to only obtain information regarding the alleged plot to kill Ms. Hufford, not information regarding the victim's murder. Based upon Mr. Lundy's role in obtaining information about the murder for hire plot, Detective Ewing asked the district attorney's office to petition for Mr. Lundy's release on bond. While out on bond on October 12, 2013, Mr. Lundy went to the jail to speak with the defendant regarding the murder for hire plot. The State entered a recording of the October 12, 2013, conversation into evidence.

Detective Ewing indicated Mr. Lundy did not become a state actor until he "became concerned about the welfare of Kelley Hufford." He again confirmed that as a state actor, Mr. Lundy was instructed to only gather information regarding the alleged murder for hire plot. Despite this admonition, Detective Ewing indicated "[t]here's some statements that may be considered as statement[s] against interest" regarding the victim's murder within the August 30, 2013, recording. Detective Ewing described his approach to gathering information about the murder for hire plot through Mr. Lundy, as follows:

> With my understanding of [the defendant's] demeanor in jail, he's very careful, very conscious of jailhouse snitches and such, so when [the defendant] and [Mr.] Lundy would talk about things they would be secretive and compartmentalize. So it was entirely possible that [the defendant would] go talk to [Mr.] Lundy about the murder for hire and [] not incriminate himself, because he's that intelligent of an individual.

Detective Ewing specified he did not discover any new information about the victim's murder during the investigation through Mr. Lundy into the murder for hire plot directed at Ms. Hufford.

Todd Eric Lundy also testified, stating he was arrested in Clarksville, Tennessee on July 19, 2013, for selling counterfeit marijuana. As a result, he was taken to the Montgomery County jail where he met the defendant. The two began talking through their jail cell doors and the defendant began revealing details about the charges for which

he was incarcerated. Upon learning information about the defendant's involvement in the victim's murder, Mr. Lundy began writing to Detective Ewing, whose name he learned from the defendant. Prior to writing Detective Ewing on August 6 and 8, 2013, Mr. Lundy had no contact with the police department or the district attorney's office. Mr. Lundy acknowledged his letters indicated he was attempting to gather information for the State about the defendant's involvement in the victim's murder even though he was not asked to do so and admitted he wrote to Detective Ewing "to try to get some help for [himself]."

On August 9, 2013, Mr. Lundy summarized the conversations he had with the defendant in both a written statement and a recorded interview with Detective Ewing. After the interview, Detective Ewing made no requests of or promises to Mr. Lundy and stated Mr. Lundy could not work for the state at that time. Mr. Lundy returned to jail and experienced no changes in his daily routine or in his interactions with the defendant.

Mr. Lundy next spoke with Detective Ewing on August 28, 2013. During this conversation, Mr. Lundy described the defendant's desire to hire someone to kill Ms. Hufford. He agreed to wear a wire in an effort to obtain additional information from the defendant about the alleged murder for hire plot targeting Ms. Hufford. Mr. Lundy explained the defendant offered him "$300 up front, and more money once [the defendant] got proof that it was done."

Upon its review, the trial court issued an order denying the defendant's motion to suppress the statements he made to Detectives Ewing and Ulrey and to Mr. Lundy. The trial court found the defendant knowingly waived his *Miranda* rights and failed to "unequivocally" invoke his right to counsel during his interview with the detectives. The trial court also determined Mr. Lundy did not act as a state agent in obtaining evidence regarding the present case, thus avoiding any constitutional violations stemming from the statements the defendant made to Mr. Lundy during their incarceration. The State proceeded to trial with this evidence.

## II. Trial

In the early morning hours of May 18, 2013, the defendant beat the victim as he slept on the couch at Ms. Hufford's home in Christian County, Kentucky. During the beating, the defendant transported the victim to Montgomery County, Tennessee where he shot the victim and burned his body. As noted by the State at trial, the overlapping nature of the relationships of the parties involved culminated in the victim's death. For years, Ms. Hufford served as a mother figure to the defendant. Not only did she provide the defendant with a trailer to live in and 1999 Ford Taurus to drive, but also she previously dated the defendant's father. In May 2013, however, Ms. Hufford was dating

both Mr. Persinger and the victim, who had recently returned to Ms. Hufford's home after being released from jail. Ms. Hufford quickly tired of the victim's presence in her home and enlisted Mr. Persinger and the defendant "[t]o get rid of [him]."

Ms. Hufford's efforts to remove the victim from her life began by asking Mr. Persinger to help her "evict" the victim from her home located at 923 Desoto Lane in Oak Grove, Kentucky. At the time, Mr. Persinger had known the victim for "about 24 years" and had recently begun dating Ms. Hufford "pretty heavy." In April 2013, after the victim's release from jail, the victim and Ms. Hufford began fighting and Ms. Hufford informed Mr. Persinger she was "fed up" with the victim.

Ms. Hufford's feelings for the victim prior to his murder were revealed at trial through a series of text messages. In one text message Mr. Persinger received from Ms. Hufford on May 14, 2013, Ms. Hufford stated she got so angry with the victim that she hit him. During this text exchange, Ms. Hufford also told Mr. Persinger the victim was "talking all kinds of s***" about Mr. Persinger and the defendant. In text messages sent on the evening of May 16, 2013, Ms. Hufford again told Mr. Persinger about the trouble she was having with the victim. Ms. Hufford stated, "[The victim] and I got into it. Said he wasn't leaving, and if he was homeless so would [the defendant] be homeless." Ms. Hufford told Mr. Persinger the victim threatened to burn down the defendant's trailer because she planned to evict the victim from her home.

Early on May 17, 2013, Ms. Hufford sent another text message to Mr. Persinger indicating she was scared of the victim and "what he might do." At trial, Mr. Persinger stated he "really wasn't" worried about Ms. Hufford's statement because "that didn't sound like [the victim]." At the time, however, Mr. Persinger responded to Ms. Hufford's text message, stating, "nice was over." Subsequently, Ms. Hufford provided Mr. Persinger with the defendant's phone number because she wanted Mr. Persinger to contact the defendant in order "to get rid of [the victim]." Mr. Persinger contacted the defendant at approximately 7:30 a.m. on Friday May 17, 2013, to discuss the victim and "the threats he had made." After speaking with the defendant, Mr. Persinger sent a text message to Ms. Hufford stating "[the defendant] said for you to call him or come see him, and for me to keep loving you. He said [the victim] goes today."

At approximately 3:00 p.m. on May 17, 2013, Mr. Persinger, Ms. Hufford, and the defendant met outside of Gate Six Liquors in Oak Grove, Kentucky. Ms. Hufford told the defendant the victim "was going to burn his house . . . the trailer . . . with his daughter in it." After hearing this, the defendant became upset, "[l]ike a stick of dynamite going off." The defendant asked Ms. Hufford if she "want[ed] [the victim] just beat up and told not to come back or do you want him killed?" Ms. Hufford stated she wanted the victim "killed." Mr. Persinger offered to "try to rebuild" the defendant's motorcycle in

exchange for the defendant's role in the victim's murder and believed the defendant was also "to receive the money and free rent."

At 4:27 p.m. on May 17, 2013, Ms. Hufford sent a text message to Mr. Persinger stating, "I love you. Hope you two boys have it all worked out." Mr. Persinger responded that they were "close," meaning the defendant "was close to going ahead and committing what he said he . . . would do." However, the defendant still "had to get things ready and to get things in order."

The defendant called Mr. Persinger at approximately 10:25 p.m. on May 17, 2013. During the phone call, the defendant indicated "he needed to do it, and get it over with." Mr. Persinger did not communicate with the defendant again until 7:33 a.m. on May 18, 2013, when the defendant asked Mr. Persinger to meet him for coffee. Mr. Persinger declined and instead, the two discussed "what happened to [the victim]" over the telephone. The defendant stated "his part of the deal was done" and he wanted to get "paid" for his work.

As such, Mr. Persinger went to the defendant's trailer, located at 165 Collier Road in Clarksville, Tennessee, to look at his motorcycle on May 18, 2013. At the defendant's trailer, Ms. Hufford gave the defendant $400 or $500 "to quiet the white boy." Ms. Hufford told Mr. Persinger "White Boy" was a friend of the defendant involved in the murder. The defendant stated "he had to pay White Boy to keep his mouth shut or else he'd have to take care of him too." Around 4:00 p.m. on May 18, 2013, Ms. Hufford took the victim's boots, cell phone, and wallet to Mr. Persinger's home located at 725 Salem Road in Clarksville, Tennessee. Mr. Persinger had "a fire going in [his] fire pit" and Ms. Hufford placed the victim's personal items and her cell phone "on the fire pit to burn, and they burned." Mr. Persinger threw the ashes of the phones "down on the fence line," but the boots and the wallet "burned up pretty much."

On May 19, 2013, the defendant and Mr. Persinger went to Ms. Hufford's home where she was "still cleaning a spot in the carpet, and blood was still coming up out of it." During this visit, the defendant told Mr. Persinger that he "broke [the victim's] neck" and told Ms. Hufford "he burned [the victim]."

A few days later, Mr. Persinger visited the defendant's trailer again and the defendant told Mr. Persinger "that he broke [the victim's] neck and, you know, beat him pretty bad. Broke his neck. Said that was all I needed to know. If I knew the rest, then I wouldn't like him at all." While at the defendant's trailer, Mr. Persinger took a "pair of boots and a tarpaulin" from the trunk of the 1999 Ford Taurus driven by the defendant and owned by Ms. Hufford. The defendant explained Mr. Persinger needed to burn the boots so "they couldn't match the insole with the bruising" on the victim. Back at his

- 9 -

home, Mr. Persinger attempted to burn the boots and the tarp, but the tarp failed to completely burn. Mr. Persinger put the remains of the tarp "in a flower container and covered it with dirt." At trial, Mr. Persinger maintained he did not plan the victim's murder with Ms. Hufford and the defendant but admitted to transmitting messages between the two. Mr. Persinger explained he simply "got into something [he] shouldn't have been into." Additionally, Mr. Persinger admitted to burning evidence because he "got scared at that time about what could happen to [him]; when they asked me to do it, I did it."

Before Mr. Persinger provided the testimony detailed above, the trial court took several steps to ensure his competency as the defendant objected to the same due to Mr. Persinger's deteriorating health. On May 21, 2013, Detective Ewing conducted a video interview with Mr. Persinger and the State played a portion of the interview for the jury. The trial court explained the video interview was being shown to provide the jury with "a clear understanding of what Mr. Persinger looked like, talked like, acted like, [and] appeared close in time to these events as compared to what you are going to see today." Afterwards, Detective Ewing testified Mr. Persinger had no trouble with his memory, with understanding the questions asked of him, or with physically moving during the May 21, 2013, interview.

The trial court questioned Mr. Persinger to further ensure his competency and then provided the following curative instruction to the jurors:

> All right, just for the curiosity of the jurors, the reason I did that is because of Mr. Persinger's health, and there has been some deterioration that was noted in his medical records over the years, I just wanted to make sure that he was physically and mentally in a position to testify. The [c]ourt has an obligation under the law to ensure that every witness that testifies is able to do so.

> Okay. So I was just trying to have some general conversation with him to see if I was picking up on anything that suggested there was going to be any difficulty in him being able to respond to the questions of the attorneys. So that's all that was. Mr. Persinger and I are not friends. I've never met him before. I've seen him in this courtroom, or one of the courtrooms in this building when I've come to visit on one occasion, but we don't know each other at all and have -- so my questioning is not intended to influence the way you evaluate his credibility. You will evaluate his credibility the same as you would any other witness throughout the -- that you'll hear throughout these proceedings.

The State continued with its case-in-chief by detailing the investigation into the victim's murder which began after Christopher Bownine discovered the charred remains of a body near a pumping station on East Fork Drive in Montgomery County, Tennessee at approximately 5:45 a.m. on May 18, 2013. Officer Adrian Anderson of the Clarksville Police Department responded to Mr. Bownine's 9-1-1 call and secured the scene.

Officers interviewed Tracy Valentine, Courtney Glasl, and James Kendrick, all of whom lived in the area where Mr. Bownine found the body. Ms. Glasl described the area as "very wooded" with "a lot of trees" and wildlife. On May 18, 2013, she woke up to a single gunshot around 2:30 a.m. Ms. Valentine also heard a gunshot that "sounded like a shotgun" in the early morning hours of May 18, 2013. James Kendrick woke up around 2:30 a.m., to his wife, who suffered from COPD, "gasping for air." He explained, "[i]t was cool enough that we ha[d] our bedroom window open, and the first thing that got my attention was the amount of smoke in the bedroom." He went outside and noticed smoke "coming from the north." Mr. Kendrick lived less than 400 yards from the pumping station near where Mr. Bownine found the body.

When Detective Ewing arrived on the scene, he observed "the deceased victim, who was lying face down on a gravel roadway near a pumping station." He noticed the body "was burned significantly" and was covered by only pajama pants. "There were no shoes that were seen, no wallet that was found or seen, no watch, or identification." However, officers found a distinct ring with an eagle on it on one of the hands of the burned body. As such, they released a likeness of the ring to the media in an effort to identify the victim.

Detective Ewing was unable to identify the victim as Jimmy Boyer until fingerprints were obtained during an autopsy performed by Dr. Bridgett Eutenier on May 19, 2013. The autopsy revealed the victim's body "was predominately charred," and he died of multimodality trauma, including blunt force injuries, thermal injuries, and a shotgun wound. Dr. Eutenier testified at trial, stating, "it's impossible to tell how much each of those [injuries] placed a role in his death" but "[i]t's the constellation of all of the injuries that caused [the victim's] death." Dr. Eutenier went on to detail the injuries suffered by the victim and throughout her testimony, the State introduced photographs of the victim documenting the same.

Regarding injuries to the head and neck, the victim suffered a bruise to his right eye and eyelid, a scrape and bruise to his right cheek, a laceration with an embedded rock to his right cheek, an abrasion to the midline of his nose, a bruise to the left eye and hemorrhage in both eyes, swelling and "red brown discoloration" to the left side of the face, a laceration to the left eye, a contusion to the right, upper lip and left edge of the lips, "red, pink discoloration to the back of the scalp" with "brown discoloration above

it," skin slippage of the forehead, and abrasions to the posterior neck. Dr. Eutenier described the discoloration seen on the victim's face as "a combination of blunt injuries with thermal injury and it may also be compounded by the settling of blood after death." Dr. Eutenier stated the victim's head was burned, not charred.

Dr. Eutenier also identified additional internal injuries to the victim's head. The victim suffered "left frontal, temporal, and parietal, subgaleal hemorrhage," or hemorrhage between the scalp and the skull. Additionally, Dr. Eutenier identified "right frontal, subgaleal hemorrhage" and "right occipital, subgaleal hemorrhages." The victim suffered subdural and subarachnoid hemorrhage in the areas protecting his brain, "[f]ocal white matter pinpoint hemorrhages" in both frontal lobes, and multiple tongue hemorrhages. Prior to his death, the victim sustained an anterior fracture to the cervical vertebra six and associated soft tissue hemorrhage. Dr. Eutenier opined the fracture alone would not cause death and explained she knew the fracture occurred prior to the victim's death because of the associated hemorrhage. According to Dr. Eutenier, "[w]hen there is hemorrhage in those areas of injury, that means that there still was a blood pressure, the heart was still beating."

Dr. Eutenier detailed injuries to the victim's extremities, noting abrasions, lacerations, and contusions to his legs, ankles, and feet. Both of the victim's femurs were fractured and sustained "thermal injuries with areas of exposed fat and muscle." The victim's left, lower leg was "completely detached" from the left thigh, while the right leg "was still attached by some soft tissue." Regarding the fractures, Dr. Eutenier explained, "based on the evaluation of the fracture and the charring, it was unclear to me if [the fractures] occurred prior to the fire or if they were acute perimortem fractures occur[ing] secondary to weakening of the bone from the fire." In reviewing a photograph of the victim's left leg, Dr. Eutenier identified "a small portion of a blue, white debris."

The victim sustained a single shotgun wound to the right buttock from which no satellite wounds existed. Dr. Eutenier could not determine the range of the gunshot due to the charring of the victim's body. However, evidence of scalloping along the wound led her to opine it was likely "an intermediate or closer wound . . . typically a few feet in distance." Dr. Eutenier observed a "pellet cup and multiple metallic projectiles present within the body" and stated the gunshot wound occurred prior to the victim's death based upon evidence of hemorrhaging associated with the injury. Toxicology tests revealed the victim had no drugs or alcohol in his system at the time of death. Additionally, no carboxyhemoglobin was found in the victim's system, indicating he likely did not inhale smoke prior to death. As a result, Dr. Eutenier stated "it was unlikely that [the victim] was alive at the time of the burning."

- 12 -

After learning the victim's identity from the autopsy report, Detective Ewing realized he knew the victim and knew he was dating Ms. Hufford. As such, at approximately 8:45 p.m. on May 19, 2013, Detective Ewing informed Ms. Hufford and her daughter, Laurie Hufford ("Laurie"), of the victim's death. Upon learning the same, Ms. Hufford was "solemn" but cooperative. She allowed officers to perform a cursory search of her home and provided the following information to Detective Ewing which further propelled his investigation.

Ms. Hufford explained she and the victim had "a troubled relationship after he'd gotten out of jail and [come] back home" and noted she last saw the victim at approximately 12:45 a.m. on May 18, 2013. The following day, she believed the victim was on a drinking binge because his boots, wallet, keys, and phone were gone and "she believed since these items were gone that [the victim] had left."

In providing more detail, Ms. Hufford stated she and the victim watched television on the couch in the living room until she went to her bedroom around 9:30 p.m. on May 17, 2013. At 12:20 a.m. on May 18, 2013, Ms. Hufford received a phone call from the defendant inviting her to a party at Rookies Sports Bar in Clarksville, Tennessee. Ms. Hufford asked the victim if he wanted to go to the bar with her, but he declined. Ms. Hufford left her house for Rookies Sports Bar around 12:45 a.m. When she arrived at the bar, however, the defendant was not there. According to Ms. Hufford, the two miscommunicated and the defendant instead went to Sidelines, a different bar. Despite the miscommunication, Ms. Hufford stayed at Rookies Sports Bar until about 3:00 a.m. While driving home, Ms. Hufford realized she left her cell phone at the bar, but she was never able to find it. When she arrived home, Ms. Hufford did not see the victim.

Detective Ewing also spoke with Laurie on the evening of May 19, 2013. In providing a statement, Laurie mentioned Mr. Persinger's name because she knew he was interested in pursuing a romantic relationship with her mother. At trial, however, Laurie explained she believed her mother and the victim's relationship was going "[p]retty good" at the time of his death. She noted because the victim "was a drinker," he typically slept on the couch in a t-shirt and plaid pajama pants and he frequently left the home. Laurie had also known the defendant for "[m]any years" as he maintained a mother/son relationship with her mother, lived in a trailer owned by her mother, and drove a Ford Taurus owned by her mother.

Laurie last saw the victim at her mother's home at approximately 3:30 p.m. on May 17, 2013, after which she left for work and did not return until nearly 10:30 p.m. As she entered the living room that evening, Laurie did not turn on the lights so as not to disturb the victim who she believed was asleep on the couch. Laurie went upstairs to her room, noting it was "just a normal night." When she awoke at 4:30 a.m. on May 18,

- 13 -

2013, to prepare for work, she did not see the victim on the couch and did not notice anything that "looked out of the ordinary."

After speaking with Ms. Hufford and Laurie, Detective Ewing attempted to verify Ms. Hufford's alibi. On May 21, 2013, he contacted the defendant who "gave a line of events from his perspective that [was] similar to Ms. Hufford's." The defendant stated on May 17, 2013, he planned to meet Ms. Hufford at a bar. However, the two "missed each other at the bars" because he went to Sidelines instead of Rookies Sports Bar. Detective Ewing then reviewed video surveillance footage from Rookies Sports Bar to further "check [Ms. Hufford's] alibi" and in doing so, Detective Ewing noticed several inconsistencies in Ms. Hufford's timeline of events. Specifically, the surveillance footage showed Ms. Hufford at Rookies Sports Bar from 1:33 a.m. to 2:10 a.m. and showed Ms. Hufford talking on her cell phone as she exited the bar.

Detective Ewing also met with Mr. Persinger on May 21, 2013. Mr. Persinger was "nervous and defensive" and denied having a romantic relationship with Ms. Hufford. Consequently, Detective Ewing obtained a search warrant for Ms. Hufford's cell phone and issued subpoenas for the records of Ms. Hufford's home phone records and Mr. Persinger's cell phone records. The search warrant provided "cell site information showing which tower each call was placed near" and provided "some of the content [] that was present through the text messages." In reviewing Ms. Hufford's cell phone records, Detective Ewing believed a romantic relationship existed between Ms. Hufford and Mr. Persinger. The text messages also made clear Ms. Hufford was upset with the victim in the days preceding his death. Detective Ewing then obtained a search warrant for Mr. Persinger's cell phone.

On May 23, 2013, Detective Ewing solicited the Regional Organized Crime Information Center ("ROCIC") to organize the cell phone information obtained from the records of the defendant, Ms. Hufford, and Mr. Persinger.[3] ROCIC helped "to extrapolate and sort cell phone text messages between the three parties, and [] to plot cell phone tower locations for calls around the time of the homicide." From this information, Detective Ewing established on May 18, 2013, the defendant's cell phone "was pinging on a cell phone tower that's in close proximity to where the [victim's] body was located." The defendant's cell phone then traveled towards Mr. Persinger's home. Detective Ewing acknowledged Sunny's Lounge, where the defendant ultimately claimed to be on the night of the murder, is across the street from the location where the victim's body was found. Additionally, Ms. Hufford's cell phone pinged off of a tower near the victim's body from approximately 1:39 a.m. to 2:12 a.m. on May 18, 2013. Detective Ewing

---

[3]Detective Ewing also obtained the victim's cell phone information, but noted it was "minimal."

noted upon leaving Rookies Sports Bar, Ms. Hufford "destroyed her phone after a certain point" as there was no activity from her phone after 2:30 a.m.

ROCIC created "a timeline to show the text messages between the parties" spanning from May 14 through May 18, 2013. The timeline detailed "all calls, texts, [and] voicemails . . . the analyst from ROCIC could correlate between Kelley Hufford, [the defendant], Frank Persinger and [the victim]." Detective Ewing detailed portions of the cell phone information summarized by ROCIC pertinent to his investigation during his testimony at trial.

On May 14, 2013, a text message exchange occurred between Ms. Hufford and Mr. Persinger which served as the impetus for the victim's murder. Ms. Hufford told Mr. Persinger, the victim "pissed me off so much I hit him. He was talking all kinds of s*** again about you and [the defendant]." Ms. Hufford informed Mr. Persinger that rings he gave her were missing and insinuated the victim stole them. Mr. Persinger sent a text message to Ms. Hufford, stating "I'm not mad. They can be replaced. It's you that I can't replace and it's you that I could never replace. I am mad someone would do that to you." Via text message on May 15, 2013, Ms. Hufford and Mr. Persinger discussed Ms. Hufford's desire to evict the victim from her home and the victim's belief that Ms. Hufford and Mr. Persinger were engaged and sleeping together.

On May 16, 2013, Mr. Persinger called the victim after being prompted by Ms. Hufford, but the victim hung up on him. Later, at 11:54 p.m., Ms. Hufford sent a text message to Mr. Persinger, stating: "[The victim] and I got into it. He said he wasn't leaving, and if he was homeless so would [the defendant] be homeless. Mad I took keys back." At 12:01 a.m. on May 17, 2013, Ms. Hufford texted Mr. Persinger, "I love you. I'm afraid of what he might do." Mr. Persinger responded, "I've tried to be nice about [the victim] but nice is over. I want you loved and happy what he can't do I know I can and will forever." At 12:45 a.m., the following text message exchange occurred between Ms. Hufford and Mr. Persinger:

> [Mr. Persinger]: There's something I need to talk to you about and need your help.
>
> [Ms. Hufford]: What?
>
> [Mr. Persinger]: He is pushing me to a place I don't want to go, but for you I will.
>
> [Ms. Hufford]: I think he's going to do something bad tomorrow towards me, you or [the defendant], either personally or property-wise.

- 15 -

[Mr. Persinger]: I won't let you live like that. I love you too much.

[Ms. Hufford]: Tomorrow will be here soon.

After reviewing the cell phone information, Detective Ewing scheduled another interview with Ms. Hufford on May 28, 2013. During the interview, Ms. Hufford "started offering information or theories about what she thought may have happened to [the victim] or what she had heard may have happened to [the victim]." Detective Ewing, however, confronted Ms. Hufford with the text messages found on her cell phone, including those detailed above, and her story quickly changed. Ms. Hufford then provided details about the murder, including that the defendant called her as he drove to her house before the murder and she unlocked the door. Based upon the information garnered from Ms. Hufford, Detective Ewing again interviewed Mr. Persinger who also agreed to cooperate with the investigation.

After interviewing both Ms. Hufford and Mr. Persinger, Detective Ewing called the defendant at 11:48 p.m. on May 28, 2013, asking him to come to the police station for an interview. The defendant waived his *Miranda* rights and his interview began at approximately 12:30 a.m. Throughout the interview, the defendant maintained he was not involved in the death of the victim but repeatedly asked Detective Ewing "if [they] had his DNA on anything." The defendant offered an alibi, stating he was at Sunny's Lounge on the night of the murder. Detective Ewing noted "[the defendant] changed the location that he was from Sidelines, as I had previously discussed with him, to Sunny's." Detective Ewing obtained a search warrant for the defendant's cell phone and performed a "phone dump" of the same in order to obtain "information inside the physical phone."

During cross-examination, Detective Ewing stated he did not personally find anything on the crime scene attributable to the defendant. However, in one crime scene photograph, evidence of "a little blue piece of material" was found. Detective Ewing explained "the same blue pieces of material were found in the Ford Taurus, the trunk, belonging -- or driven by [the defendant] upon a search warrant executed on that vehicle." Additionally, a "burnt up" tarp was found at Mr. Persinger's home and "a blue piece of material, blue and white piece of material" was found on the victim's leg.

During Detective Ewing's testimony, a summation of the text messages and phone calls occurring between the defendant, the victim, Ms. Hufford, and Mr. Persinger was entered into evidence. Buccal swabs of the defendant, Ms. Hufford, and Mr. Persinger along with nail clippings and a blood sample of the victim were entered into evidence. Shotgun pellets and the shotgun wadding removed from the victim's body during the autopsy and photographs of the same were also entered into evidence. Charred plaid

pants and accompanying photographs obtained during the victim's autopsy were entered into evidence. A photograph of Mr. Persinger's truck, which is seen on the video outside of Gate Six Liquors during the meeting between the defendant, Mr. Persinger, and Ms. Hufford on May 17, 2013, was entered into evidence.

The State continued its proof by introducing evidence obtained from multiple crime scenes by the numerous officers involved in the investigation. Officer William King collected evidence from the crime scene where the victim's body was found, including charred remains, soil "collected from just inside the victim's inner thigh area," a stick, a bandana, and "some type of clothing." Special Agent Reilly Lewis performed fire debris analysis on the charred debris, a soil sample, and "charred cloth material and debris from the victim." All of the items tested "revealed the presence of an evaporated gasoline range product."

Officer Darren Koski participated in the investigation at the defendant's home where officers found a red gas can on the living room floor, a blue tarp, a sawed-off shotgun "in-between the two mattresses" of the defendant's bed, a spent shotgun shell casing, a 410 shell inside of the shotgun, and a box of 410 shotgun shells. Photographs depicting the above-described items were entered into evidence. Agent Charly Castelbuono performed DNA analysis on the gas can and found the victim's blood on the same. Additionally, swabs of reddish brown stains taken from a wall and door frame of the defendant's home and from the defendant's master bedroom and closet were entered into evidence.

Agent Castelbuono also performed DNA analysis on the shotgun found at the defendant's home, finding the presence of "a mixture of at least two individuals" including the defendant. Special Agent Kevin Warner, an expert in forensic science, firearms, and tool marks, tested the plastic wadding found in the victim's body to the sawed-off shotgun discovered at the defendant's home. Special Agent Warner determined the wadding found in the victim's body was fired from the sawed-off shotgun found at the defendant's home. He explained, "[t]he reason I was able to match it is because of the defect that was left on the end of the barrel as a result of sawing it."

Officer King searched the 1999 Ford Taurus driven by the defendant and owned by Ms. Hufford. Upon testing swabs of reddish brown stains taken from the 1999 Ford Taurus, Agent Castelbuono found the victim's blood on the front passenger side of the center console, the front passenger side floor trim, and the rear driver's side seat stitching.[4] Agent Castelbuono also performed DNA analysis on a floor mat from the

---

[4]Agent Castelbuono clarified the blood found on the driver's side seat stitching revealed a partial DNA profile consistent with the victim.

vehicle which contained the victim's blood. Three prints were lifted from the "inside part of the trunk lid" of the of the 1999 Ford Taurus and were tested by Special Agent Harry Woods who determined the lifts were unidentifiable. In addition, blue fibers were found inside the trunk and photographs of the same were entered into evidence.

Officer Koski participated in the investigation at Ms. Hufford's home. Photographs depicting reddish brown stains found in the living room were entered into evidence. A portion of the living room carpet containing reddish brown stains along with a second layer of carpet cut from Ms. Hufford's living room floor was entered into evidence. Agent Castelbuono identified the victim's DNA on Ms. Hufford's carpet and on a couch cushion.

The State entered into evidence numerous photographs depicting Officer Scott Beaubien's investigation of Mr. Persinger's home. Specifically, the State displayed photographs of Mr. Persinger's back yard showing a ditch "on the backside of the residence," his back porch area with a fire pit, planters located on the back porch, "a little square metal piece that [they] found in [the] fire pit itself," the fire pit before officers sifted through it, burned cell phone parts found beyond the fence line, "a log that had some burnt blue plastic that had been . . . melted to it," a "burnt plastic piece," and a rubber piece.

Miranda Gaddes, an expert in forensic science, compared the pieces of blue tarp found in the trunk of the 1999 Ford Taurus and on the log from Mr. Persinger's home to the tarp found at the defendant's home. Her testing revealed the blue tarp material found on the log and in the trunk "could share a common origin," but neither came from the tarp found at the defendant's home. Additionally, Ms. Gaddes compared a tire casting taken from the location of the victim's body to the 1999 Ford Taurus and concluded they did not match.

As the investigation progressed, Detective Ewing contacted numerous individuals who interacted with the defendant in the days before and after the victim's murder. Cassandra Hern worked at Mapco Express where the defendant purchased gas on a daily basis. On the evening of May 17, 2013, Ms. Hern sold the defendant beer, cigarettes, and $10 worth of gas. Ms. Hern stated the defendant typically only bought $5 worth of gas. Maranda James, a bartender at Sunny's Lounge, saw the defendant at the bar at approximately 6:45 p.m. on May 18, 2013. She described the defendant as "very jumpy" and "[h]e was acting different; he wasn't as cheery or talkative as normal."

David Griffey and Richard Anderson worked with the defendant in May 2013. On the morning of May 18, 2013, the defendant reported to work but "asked to go home" as "it just was kind of obvious he'd been out partying." Mr. Anderson stated "[the

defendant] just didn't look normal, he didn't look like himself." Mr. Griffey knew the defendant did not like his "mom's" boyfriend because "all the guy did was lay on the couch." Mr. Anderson also remembered the defendant "didn't care for [the victim]." After the victim's death, the defendant told Mr. Anderson the victim "was his mom's boyfriend" and asked Mr. Anderson to search for information about the death. Additionally, the week after the victim's murder, the defendant told Mr. Anderson he purchased new shoes because his old shoes "were falling apart."

Todd Eric Lundy testified regarding the conversations he had with the defendant while in jail.[5] After being arrested, Mr. Lundy spent approximately two-and-one-half months in the Montgomery County Detention Center where he met the defendant and the two "would talk every day." The defendant told Mr. Lundy he killed the victim for Ms. Hufford in exchange for reduced rent. The defendant explained Ms. Hufford and the victim were "in a relationship and she wanted out of it . . . and she wanted . . . [the defendant] to get rid of [the victim] for her so she could probably be with . . . [Mr. Persinger], the other co-defendant."

Further, the defendant told Mr. Lundy that Ms. Hufford threatened the victim on the night she tried to evict him by stating she would call the defendant to help her. Upon doing so, the victim "said call that f***** n*****; I'll kill him and his daughter." Ms. Hufford told the defendant what the victim said, and the defendant "got really furious." As a result, the defendant and "another person" went to Ms. Hufford's home where the murder began. However, because they "were making too much noise," the defendant and his companion "moved the body from [Ms. Hufford's home] to where it was found." The defendant told Mr. Lundy that he "[s]hot, cut and burned the m*********** up."

Regarding evidence in the case, the defendant told Mr. Lundy he "got rid of" the murder weapon prior to the police searching his home and also stated the police did not have his DNA from the scene. However, the defendant mentioned there were blood stains at Ms. Hufford's home that "she did a lousy job of cleaning [] up, and she tried to just put a rug over it, and they found it." The defendant discussed how he instructed Mr. Persinger and Ms. Hufford to burn the victim's cell phone and wallet, but Mr. Persinger "didn't burn it in time and they got that evidence." Mr. Lundy admitted he hoped to get help from the State in exchange for the information he provided about the victim's murder.

---

[5]Prior to Mr. Lundy's testimony, the trial court ruled any testimony regarding the alleged murder for hire plot targeting Ms. Hufford was not admissible and warned Mr. Lundy to avoid mentioning the same.

Detective Ulrey also detailed his participation in the investigation at trial. Like Detective Ewing, he responded to the crime scene on East Fork Drive and introduced into evidence photographs of the victim's body as he found it on May 18, 2013. Detective Ulrey watched the video surveillance footage from Gate Six Liquors which showed Mr. Persinger's Ford Ranger and Ms. Hufford's "maroon Ford Taurus that [the defendant] was in possession of" in the parking lot at 3:22 p.m. on May 17, 2013. After interviewing Mr. Persinger, Detective Ulrey searched his home for certain items mentioned during the interview, including two pairs of boots, portions of which were located "in a ditch-line where Mr. Persinger had told me he had dumped a bunch of ashes from his fire pit."

Detective Ulrey also participated in the defendant's interview on May 29, 2013. Though the defendant maintained he was not involved in the victim's murder, Detective Ulrey stated the defendant "made several incriminating admissions to [him] during [their] conversation." When the defendant learned he was facing life in prison, Detective Ulrey noted the defendant "kind of looked down and said something about [Ms. Hufford] should have never told me that, and I should have never opened the door." The defendant admitted to meeting Ms. Hufford and Mr. Persinger at Gate Six Liquors where Ms. Hufford told him she "was sick and tired of [the victim]" and "she wanted [the victim] gone." While looking at a crime scene photograph of the victim, the defendant "pointed at it and said she should have never told me that; I had no beef with this man." Later in the interview, the defendant admitted he "snapped" after learning what the victim supposedly said about burning down his trailer and alleged, "I will burn this city down before I let him hurt my daughter."

Detective Ulrey also stated Mr. Persinger took cleaning fluids to Ms. Hufford's home in order to clean up blood from the carpets after the murder. Detective Ulrey and his team were unable to identify "White Boy" during their investigation. However, Detective Ulrey believed "White Boy" was a code name for Ms. Hufford. He further stated, "I believe [Ms. Hufford] helped [the defendant] after [the defendant] beat [the victim] unconscious[.] [Ms. Hufford] helped [the defendant] carry him outside and loaded him in the car."

During Detective Ulrey's testimony, the State played the video recording of the defendant's interview, skipping over portions of the interview which referenced the defendant's criminal history. According to the record, however, "one word" referencing the defendant's criminal history was played at trial. The defendant subsequently moved for a mistrial, but the trial court denied the same. The State continued to play the interview for the jury and the defendant renewed his motion for a mistrial after hearing "additional language" to which he objected. Based upon the record, the objectionable

language refers to a "rap sheet." The trial court again denied the defendant's motion for a mistrial.

Kimberly Deist, the mother of the defendant's daughter, received a phone call from the defendant during his interview with Detective Ulrey. During the phone call, the defendant "just said I can't tell you what's going on, but hey, just tell [my daughter] that daddy loves her, and . . . he's sorry." Ms. Deist also testified the defendant stored a sawed-off shotgun in between the mattresses of his bed.

The State concluded its proof by recalling Detective Ewing who detailed two phone calls made by the defendant while incarcerated. On a July 12, 2013, phone call with Ms. Deist, the defendant referenced threats made against his daughter that were "nearly identical to a reference that he made during his interview." On May 31, 2013, two days after officers executed a search warrant on his home, the defendant asked his aunt and uncle if his bed had been overturned. Upon learning his bed was overturned, the defendant was upset and stated the police "had everything [they] needed now." Both the July 12, 2013, and May 31, 2013, phone calls were entered into evidence. After the State closed its proof, the defendant elected not to testify, and the jury convicted the defendant as charged. The defendant filed a motion for a new trial which was denied, and this timely appeal followed.

*Analysis*

I.  Motion to Suppress

The defendant asserts the trial court erred in not suppressing the pre-trial statements he made to Detectives Ewing and Ulrey and to Mr. Lundy. The defendant claims the detectives twice violated his Fifth Amendment rights during his initial custodial interrogation of May 29, 2013. Separately, the defendant asserts "[t]he actions of [Mr.] Lundy were akin to interrogation as an agent of the police" and violated his Sixth Amendment right to counsel. The State argues neither the defendant's Fifth nor Sixth Amendment rights were violated by the detectives or during his conversations with Mr. Lundy. Upon our review, we agree with the State.

Suppression issues on appeal are subject to a well-established standard of review. Appellate courts are bound by a trial court's findings of facts determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Matthew T. McGee*, No. E2011-01756-CCA-R3-CD, 2012 WL 4017776, at *2 (Tenn. Crim. App. Sept. 13, 2012). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact."

- 21 -

*Odom*, 928 S.W.2d at 23. Appellate courts should consider the entire record, affording the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence." *McGee*, 2012 WL 4017776, at *2 (citing *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001)); *see also State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). However, applying the law to the factual findings of the trial court is a question of law, which is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The defendant challenges the constitutionality of the waiver of his *Miranda* rights made prior to giving a statement to Detectives Ewing and Ulrey. The Fifth Amendment to the United States Constitution, applicable to states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. If a suspect is in police custody "or otherwise [has been] deprived of his freedom of action in any significant way," the police must first inform him of his Fifth Amendment rights for any subsequent confession to later be admissible as substantive evidence. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In this regard, the United States Supreme Court has said, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* These rights may be voluntarily, knowingly, and intelligently waived. *Id.*

The *Miranda* decision only applies "to the questioning of an individual who has been taken into custody or otherwise deprived of his freedom by the authorities in a significant way." *State v. Dailey*, 273 S.W. 3d 94, 102 (Tenn. 2009) (quoting *Miranda*, 384 U.S. at 478) (internal quotation marks omitted). Accordingly, *Miranda* warnings are only required when a suspect is (1) in custody and (2) subjected to questioning or its functional equivalent. *State v. Walton*, 41 S.W. 3d 75, 83 (Tenn. 2001). In the absence of either, *Miranda* requirements are not necessitated. *Id.*

The defendant's May 29, 2013 statement made to both Detective Ewing and Detective Ulrey was clearly the result of a custodial interrogation as he was handcuffed at the Clarksville Police Department. *See State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). Thus, in order to be admissible, the defendant's statement must have been voluntarily given. *See Arizona v. Fulminate*, 499 U.S. 279, 286-88 (1991); *see also State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (stating "the voluntariness test remains distinct from *Miranda*"). A confession is involuntary if it results from "'any sort of threats or violence, . . . any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim.

App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).  "[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion."  *Climer*, 400 S.W.3d at 568.  A defendant's subjective perception alone is insufficient to support a finding that a confession was not voluntary.  *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). Instead, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id*.

When evaluating the voluntariness of a statement, courts consider the totality of the circumstances, including "characteristics of [the] accused and details of the interrogation." *Climer*, 400 S.W.3d at 568.  Relevant factors include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id*.

In the present case, the defendant asserts he was not properly *Mirandized* prior to his interview with Detectives Ewing and Ulrey.  We, however, disagree as the record supports the trial court's finding that the defendant waived his *Miranda* rights prior to the interview.  In denying the defendant's motion to suppress, the trial court found:

> Importantly, Detective Ewing properly *Mirandized* the [d]efendant prior to any questioning.  Detective Ewing explained the *Miranda* waiver form and asked the [d]efendant if he understood these rights.  Detective Ewing specifically asked, "Do you understand?" after reading the waiver form.   The [d]efendant answered affirmatively.   Furthermore, the [d]efendant signed the *Miranda* waiver that acknowledged he was "knowingly and intelligently" waiving his *Miranda* rights before questioning.  Therefore, [the] [d]efendant's claim that he was not properly *Mirandized* prior to being subjected to questioning by Detective Ewing and Detective Ulrey fails.

- 23 -

We agree with the trial court's finding that the defendant received proper *Miranda* warnings, which he waived, prior to his interview. Before speaking with the detectives, Detective Ewing read the defendant his *Miranda* rights, reviewed a waiver of the same, and confirmed with the defendant that he understood both his rights and the waiver form. After receiving an affirmative response from the defendant, the interview began. The trial court found the testimony of Detective Ewing to be credible and nothing in the record preponderates against this finding of fact. Accordingly, we will not disturb it on appeal. *Odom*, 928 S.W.2d at 23; *McGee*, 2012 WL 4017776, at *2.

The defendant also argues his statement was the product of coercion due to his lack of sleep. The defendant suggests the detectives used "coercive methods" which "created duress upon [him] to make incriminating statements to get sleep following his continued complaints of sleep deprivation." The trial court disagreed, finding:

> Although the interview was conducted in the early morning hours with the [d]efendant having had very little sleep, the [d]efendant appeared to respond appropriately to the questions asked and otherwise appeared focused. He did not nod off or complain that he was too tired to comprehend the seriousness of the situation. His demeanor during the interview appears to belie his consistent complaints of being tired or sleepy.

Again we agree with the findings of the trial court. The defendant's interview began at approximately 12:30 a.m. on May 29, 2013. While it is reasonable for the defendant to complain of being tired during the hours in which his interview was conducted, nothing in the record suggests he was unable to communicate with the detectives during the same. Rather, Detective Ewing testified the defendant was "successful in communicating his point" throughout the interview and described the defendant as manipulative and controlling during their discussion. Detective Ulrey described the defendant as "very cordial," coherent, and grateful. The interview lasted for several hours during which both Detectives Ewing and Ulrey made accommodations for the defendant by allowing him numerous smoke breaks and permitting him to make a telephone call to his daughter's mother. Nothing in the record supports the defendant's argument on appeal that his statements were the result of coercion or in violation of his constitutional rights. The defendant is not entitled to relief on this issue.

Further, as it relates to the May 29, 2013 statement, the defendant asserts he invoked his right to counsel while speaking with Detective Ulrey. In reviewing this issue, the trial court found:

In the instant case, the [d]efendant did not unequivocally request an attorney. Instead, he asked what would happen if he requested an attorney. Detective Ulrey responded by explaining that the [d]efendant could request an attorney at any time. The [d]efendant made no mention of requesting an attorney after this initial question. The [d]efendant's statement is very similar to statements that have been found to be equivocal or ambiguous. . . . As such, the Defendant did not properly invoke his right to counsel. Therefore, Detective Ulrey's questioning of the [d]efendant was not improper and the [d]efendant's motion to suppress fails on this argument.

Again, we agree with the determinations of the trial court. During his interview, the defendant asked Detective Ulrey what would happen if "at this moment I say -- if I say I want an attorney?" Detective Ulrey explained the interview would end and reiterated the defendant's right to counsel was his "absolute" right. While Detective Ulrey expressed his preference of continuing the interview, he made no objections or refusals in allowing the defendant the option of exercising his right to counsel. The defendant, however, chose to continue the interview absent counsel and made no further mention of the same. Accordingly, the record shows the defendant failed to unequivocally request counsel and as such, Detective Ulrey was under no obligation to end the interview. *Climer*, 400 S.W.3d at 563 ("Questions that merely probe the parameters of *Miranda* rights are properly characterized as equivocal statements made by a person who is still in the decision making process.") (internal quotations omitted). For these reasons, the May 29, 2013, statement was admissible and not subject to suppression and the defendant is not entitled to relief.

Separately, the defendant asserts the statements he made to Mr. Lundy were subject to suppression because through Mr. Lundy, the detectives violated his Sixth Amendment right to counsel. The defendant submits the detectives "engaged in a course of action which deprived the [d]efendant of his right" to have counsel present during the Lundy conversations. Our case law, however, makes clear:

[F]or a cooperating witness or informant to be deemed a 'government agent' for purposes of the Sixth Amendment right to counsel, the defendant must show that the principal--the State, in the form of law enforcement officers--manifested assent, either explicitly or implicitly, to have the cooperating witness act as a government agent, and that the State had some level of control over the witness's actions with respect to the defendant.

*State v. Willis*, 496 S.W.3d 653, 710 (Tenn. 2016), *cert. denied* (internal citations omitted).

Upon its review, the trial court found the statements the defendant made to Mr. Lundy about the victim's murder occurred absent state action and thus, were not subject to suppression. The trial court explained:

In the first two letters from [Mr.] Lundy to the Clarksville Police Department and Detective Ewing . . . Mr. Lundy cannot be considered an agent of the state because he had not talked to Detective Ewing or entered into any kind of an agreement with Detective Ewing prior to writing the letters. Mr. Lundy sent the letters by his own initiative and had purely selfish motivations.

Further, Mr. Lundy's first written statement . . . also contains information obtained prior to any direct or implied agreement between Mr. Lundy and Detective Ewing. Even after Detective Ewing brought Mr. Lundy in for the first interview . . . they still had not entered any kind of agreement. Detective Ewing tells Mr. Lundy at approximately the 47:00 minute mark, "I can't have you working for me," and, although Detective Ewing later gave Mr. Lundy his business card in case he heard something significant, he did not instruct Mr. Lundy to question the [d]efendant or even to continue talking to the [d]efendant. Mr. Lundy testified at the hearing on this motion that he was acting on his own initiative between August 9 and August 28 when he wrote a series of letters to Detective Ewing.

Furthermore, Mr. Lundy was not being paid to obtain information, the police did not arrange any forced interaction by moving Mr. Lundy closer to the [d]efendant in prison, and Detective Ewing did not promise Mr. Lundy anything for his cooperation. Therefore, Mr. Lundy was not a state agent under the totality of the circumstances at this point in the investigation. . . . The [d]efendant has not provided any proof that Mr. Lundy and the police deliberately elicited any incriminating remarks as is required to establish a Sixth Amendment violation. Therefore, the [d]efendant's argument that the police violated his Sixth Amendment right to counsel, on the basis of Mr. Lundy's letters about the instant case, fails.

Again, we agree with the trial court's assessment of the admissibility of the statements at issue. As specified at the motion to suppress hearing by Mr. Lundy and Detective Ewing, Mr. Lundy's letters of August 6 and 8, 2013, were initiated solely by Mr. Lundy in an effort "to try to get some help for [himself]." After meeting on August 9, 2013, Detective Ewing made clear Mr. Lundy could not and did not work for the state.

Though Mr. Lundy returned to jail and continued to gather information from the defendant about the present murder, the record makes clear he did so absent any aid or encouragement from Detective Ewing. Accordingly, Mr. Lundy did not act on behalf of the state in his efforts to gather information about the present case.

On August 19, 2013, Mr. Lundy wrote another letter to Detective Ewing informing him of the defendant's desire to hire Mr. Lundy to kill Ms. Hufford. Subsequently, Detective Ewing and Mr. Lundy met again and agreed to work together to obtain information from the defendant about the alleged murder for hire plot against Ms. Hufford. Detective Ewing testified he instructed Mr. Lundy to only seek information regarding the murder for hire plot, rather than information on the victim's murder. Nothing in the record suggests Mr. Lundy failed to follow Detective Ewing's instructions and any comments made about the present case during Mr. Lundy's recorded conversations with the defendant about the murder for hire plot were incidental.

As noted above, for a confession to be deemed involuntary, "it must be the product of coercive state action." *State v. Downey*, 259 S.W.3d 723, 733 (Tenn. 2008) (internal citations omitted). Here, not only were the statements made to Mr. Lundy about the victim's murder not the result of state action, but both Detective Ewing and Mr. Lundy agreed the information obtained from Mr. Lundy's attempts to help himself began before Detective Ewing ever spoke to Mr. Lundy. Accordingly, the trial court properly concluded Mr. Lundy was not a state actor and, in turn, did not err in denying the defendant's motion to suppress. The record makes clear Mr. Lundy only worked for the State in his attempts to gather information about the alleged murder for hire plot. Accordingly, nothing in the record preponderates against the trial court's assessment that the defendant's pre-trial statements were given voluntarily and passed constitutional muster. The defendant is not entitled to relief.

II. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence supporting his conviction for premeditated first degree murder, arguing "the State failed to show [the] [d]efendant [] intentionally killed the victim." The State contends the evidence produced at trial was sufficient to support the defendant's conviction. Upon our review, we agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or

jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

The jury convicted the defendant of the first degree, premeditated murder of the victim. First degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202 (a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202 (d). Tennessee Code Annotated section 39-13-202 (d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

In attacking the sufficiency of the evidence as to his premeditated first degree murder conviction, the defendant argues "[t]he State did not produce any witnesses at trial who could place [the defendant] at the crime scene." The defendant claims "[t]here was no eye witness testimony" and "the evidence collected in this matter does not support the conviction of [the defendant]." The record, however, does not support this argument.

Rather, the evidence shows on the afternoon of May 17, 2013, the defendant, Ms. Hufford, and Mr. Persinger met in the parking lot of Gate Six Liquors where the defendant agreed to kill the victim in exchange for motorcycle repairs and rent money.

The defendant prepared for his crimes during the remainder of the day and called Mr. Persinger at approximately 10:25 p.m. to inform Mr. Persinger that "he needed to do it, and get it over with." The defendant then drove to Ms. Hufford's home where the victim was asleep on the couch. Ms. Hufford unlocked the door, and the defendant began beating the victim. In order to avoid waking Laurie, who was asleep upstairs in Ms. Hufford's home, the defendant loaded the beaten victim into the 1999 Ford Taurus and transported him to East Fork Drive in Montgomery County, Tennessee. After removing the victim from the vehicle, the defendant shot him in the buttocks with his sawed-off shotgun and then burned the victim's body. Residents in the area heard a single gunshot at approximately 2:30 a.m. and saw smoke. The defendant's cell phone records showed his phone ping off of a tower near the location of the victim's body on East Fork Drive in the early morning hours of May 18, 2013. The next morning, the defendant contacted Mr. Persinger to inform him "his part of the deal was done" and he wanted to get paid.

After killing the victim, however, the defendant tried to cover up his crimes. First, the defendant burned the victim's body. Special Agent Lewis found "the presence of an evaporated gasoline range product" on the charred remains and debris collected from near the victim's body. Officers found a gasoline can with the victim's blood on it in the defendant's trailer. The defendant asked Mr. Persinger to burn a "pair of boots" and a tarp he had in the trunk of the 1999 Ford Taurus. At trial Agent Gaddes noted portions of the blue tarp found on a log at Mr. Persinger's home were similar to "blue pieces of material" found in the 1999 Ford Taurus. The victim's blood was also found in the 1999 Ford Taurus on the front passenger side of the center console, the front passenger side floor trim, the rear driver's side seat stitching, and a floor mat.

The defendant told Mr. Persinger and Mr. Lundy he broke the victim's neck and Dr. Eutenier's autopsy revealed the victim suffered an anterior fracture to the cervical vertebra six. Dr. Eutenier detailed numerous other blunt force and thermal injuries suffered by the victim, including a single gunshot wound to the right buttock. Officers found a sawed-off shotgun in between the mattresses of the defendant's bed and Special Agent Warner matched the plastic wadding found in the victim's body to the same.

During his interview with Detective Ulrey, the defendant confessed he "snapped" after Ms. Hufford claimed the victim said he would burn the defendant's trailer with his daughter inside. The defendant lamented, Ms. Hufford "should have never told me that; I had no beef with this man." While in jail, the defendant told Mr. Lundy he "[s]hot, cut, and burned" the victim for Ms. Hufford.

Looking specifically to the premeditation factors outlined by our Supreme Court, the record establishes Ms. Hufford expressed her desire for the defendant to kill the victim in the afternoon of May 17, 2013. Ms. Hufford angered the defendant by telling

him the victim threatened to burn down the defendant's trailer. The defendant "snapped" and prepared for the murder for the remainder of the day. At approximately 10:25 p.m. the defendant called Mr. Persinger and indicated he was ready to carry out the murder. The defendant drove to Ms. Hufford's home where the victim was unarmed and asleep on the couch. The defendant began beating the victim, but stopped to move the victim out of Ms. Hufford's home so as to not wake up Laurie. The defendant placed the victim in the 1999 Ford Taurus, drove to Montgomery County, Tennessee, removed the victim from the vehicle, shot him in the right buttock, and burned his body. After doing so, the defendant attempted to go to work but was unable to complete his shift. The defendant left work and went to a bar. *See Bland*, 958 S.W.2d at 660. The record makes clear the defendant beat, shot, and burned the victim on May 18, 2013, after plotting to do so with Ms. Hufford and Mr. Persinger the previous day. As such, the record supports the jury's finding of premeditation in that the defendant participated in the death of the victim "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202 (d). The defendant is not entitled to relief.

### III. Trial Court's Rulings

#### a. Jursidiction

The defendant asserts the trial court erred by failing to "dismiss all counts related to the assault and death of [the victim] as evidence could not establish with any degree of reliability, where the actions leading to and death of the victim occurred." The defendant suggests the victim died in Kentucky, not in Tennessee, and the trial court lacked jurisdiction over "all counts of the indictment related to aggravated assault and murder." The State asserts it "showed by a preponderance of the evidence, at a minimum, that at least one element of each challenged offense occurred in Montgomery County." Our review of the record indicates the State established jurisdiction at trial.

The Tennessee Constitution allows a criminal defendant to be tried "by an impartial jury of the County in which the crime shall have been committed." Tenn. Const. art. I, § 9. Accordingly, a trial court's jurisdiction is established when a crime is committed, "at least partially, within the territorial boundaries of the county in which it sits." *State v. Spina*, 99 S.W.3d 596, 598 (Tenn. Crim. App. 2002) (citing *Ellis v. Carlton*, 986 S.W.2d 600, 601 (Tenn. Crim. App. 1998); Tenn. Code Ann. § 39-11-103(d) ("If one (1) or more elements of an offense are committed in one (1) county and one (1) or more elements in another, the offense may be prosecuted in either county.")); *see also* Tenn. R. Crim. P. 18.

The defendant takes issue with the jurisdiction of the trial court over his premeditated first degree murder conviction.[6] However, the record establishes the victim died in Montgomery County, Tennessee. Trial testimony from Mr. Lundy, Detectives Ewing and Ulrey, and Mr. Persinger, revealed the defendant began his attack on the victim at Ms. Hufford's home in Oak Grove, Kentucky. As the crimes against the victim escalated, the defendant removed the victim from Ms. Hufford's home, placed him in the 1999 Ford Taurus, and took him to East Fork Drive in Montgomery County, Tennessee. Once in Tennessee, the defendant shot the victim and burned his body.

At trial, Dr. Eutenier testified in detail to the severe beating the victim endured prior to his death, which included a broken neck, abrasions, cuts, and lacerations to his extremities, and significant injuries to his face and head. Dr. Eutenier noted the victim suffered a single gunshot wound to the right buttock prior to his death based upon evidence of hemorrhaging associated with the injury. While it is undisputed the defendant likely inflicted many injuries against the victim at Ms. Hufford's home, Dr. Eutenier explained "the constellation of all of the injuries" caused his death which did not come until after he was shot as he lay on the side of East Fork Drive in Montgomery County, Tennessee. The defendant is not entitled to relief as to this issue.

### b. The Competency of Frederick Persinger

The defendant contends the trial court erred in finding Mr. Persinger competent to testify at trial, arguing "[m]edical records of [Mr. Persinger] indicated [he] suffered from medical conditions which had deteriorated his physical appearance and impacted his ability to recall events." The State disagrees, arguing the defendant "failed to present evidence overcoming the presumption of competency." We agree with the State.

The Tennessee Rules of Evidence instruct "[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statute." Tenn. R. Evid. 601. A trial court retains discretion in determining a witness's competency, "and the trial court's decision will not be overturned absent abuse of that discretion." *State v. Nash*, 294 S.W.3d 541, 548 (Tenn. 2009) (citing *State v. Caughron*, 855 S.W.2d 526, 538 (Tenn. 1993)). Prior to his testimony at trial, the trial court conducted a thorough examination into Mr. Persinger's competency. Not only did Mr. Persinger engage in a colloquy with his own attorney in waiving his testimonial rights, but also the trial court questioned Mr. Persinger on its own accord to further ensure his competency. At trial, Mr. Persinger provided a detailed review of the relationships that existed, the

---

[6]In his brief, the defendant argues the trial court lacked jurisdiction over "all counts of the indictment related to aggravated assault and murder." We note, however, the defendant was not charged with or convicted of aggravated assault. As a result, we will only address jurisdiction as it relates to the defendant's murder conviction.

conversations he engaged in, and the actions he took both before and after the victim's murder. While the record suggests Mr. Persinger's health had deteriorated, it does not support a finding of incompetency in this instance. Nothing in the record supports the defendant's argument that the trial court abused its discretion in permitting the testimony of Mr. Persinger. As such, the defendant is not entitled to relief.

### c. Motion for a Mistrial

The defendant argues the trial court erred in denying his motion for a mistrial after the State introduced evidence "that the defendant was a convicted felon" through the audio recording of the defendant's May 29, 2013, interview with Detectives Ewing and Ulrey. The State contends the defendant waived this issue for failing to cite to any legal authority in support of the same. The State further argues the defendant is not entitled to relief because "the record does not adequately show what was played" to the jury and the defendant has "failed to articulate how the trial court abused its discretion in denying the motion or why a mistrial was a manifest necessity."

As noted by the State, this issue has been waived for the defendant's failure to cite to legal authority in support of his argument. Tenn. R. App. P. 27(a)(7)(A) (requiring an argument to set forth: "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on"). Regardless, the defendant still is not entitled to relief as he has failed to meet his burden of showing a mistrial was warranted due to a manifest necessity. *See State v. Leath*, 461 S.W.3d 73, 100 (citing *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). In Tennessee, a mistrial "should be granted 'only in the event of a manifest necessity that requires such action.'" *Id.* (quoting *State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998) (appendix) (internal quotations omitted)). The burden of establishing a "manifest necessity" lies with the party seeking the mistrial. *Id.* (citing *Williams*, 929 S.W.2d at 388). However, the decision to grant a mistrial lies with the discretion of the trial court which will be reviewed for abuse of discretion. *Id.*

Here, the defendant argues a mistrial was warranted because the jury twice heard references to his criminal history during his recorded interview played at trial. The record, however, does not support this argument as it indicates the State skipped portions of the defendant's interview referencing his criminal history with particularity at trial. While our review of the record suggests the jury heard "one word" relating to the defendant's criminal history and heard the term "rap sheet," nothing suggests a manifest necessity exists in this instance to warrant a mistrial. The defendant has failed to provide specifics as to how the "impermissible references" or "incriminating words" heard by the jury prejudiced his trial. The overwhelming amount of evidence of the defendant's guilt

also weighs against a finding of manifest necessity. Accordingly, the trial court did not abuse its discretion in denying the defendant's motion for a mistrial and the defendant is not entitled to relief.

### d. Motion for Judgment of Acquittal

The defendant argues the trial court erred in denying his motion for judgment of acquittal at the close of the State's proof while the State asserts the evidence was sufficient to support the defendant's convictions. The defendant's brief fails to provide any legal authority or argument supporting his assertion that the trial court erred in this regard. Tenn. R. App. P. 27(a)(7)(A). As such, it has been waived. Additionally, as previously addressed, the proof of the defendant's guilt is overwhelming.

### e. Jury Instruction on the Defense of Others

The defendant next asserts the trial court erred in denying his request for a jury instruction on the defense of others, suggesting the proof at trial indicated the defendant "had motive to kill the victim as the victim had threatened the life of [the] [d]efendant's daughter by threatening to burn the [d]efendant's home to the ground with he and his daughter inside." The State argues the evidence at trial did not warrant the defense of others instruction as "there was no proof that the defendant believed immediate intervention was necessary to protect his daughter." Further, however, the State again claims the defendant is not entitled to relief for failing to cite to any legal authority in support of this alleged error of the trial court, and we agree. Absent legal authority to support this claim, it is deemed waived by this Court. Tenn. R. App. P. 27(a)(7)(A).

### f. Motion for New Trial

Finally, the defendant asserts the trial court erred in denying his motion for new trial pursuant to Rule 33 (d) of the Tennessee Rules of Criminal Procedure. The defendant argues the evidence produced at trial "did not support the determination made by the jury" whereas the State contends "[t]he trial court summarily denied the motion for new trial, and in doing so, fulfilled its duty as the thirteenth juror." We agree with the State.

Pursuant to Rule 33 of the Tennessee Rules of Criminal Procedure, "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33. "The rule 'is the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." *State v. Biggs*, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006) (citing *State v. Blanton,* 926 S.W.2d 953,

958 (Tenn. Crim. App. 1996). Rule 33 (d) "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). Thus, "when a trial judge overrules a motion for new trial, this [C]ourt may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict." *Blanton*, 926 S.W.2d at 958 (citing *Carter*, 896 S.W.2d 119, 122 (Tenn.1995)).

Here, the record indicates the trial court denied the defendant's motion for new trial and, as such, properly fulfilled its duty as the thirteenth juror. Specifically, before entering a written order denying the defendant's motion for new trial, the record shows the trial court conducted a thorough review of the defendant's case by considering the arguments of counsel, reviewing the trial transcripts, and studying the entire record. The defendant has failed to provide any evidence establishing how the trial court might have disagreed with the weight of the evidence determined by the jury at trial. Additionally, as detailed throughout this opinion, the defendant has failed to put forth evidence to show the proof at trial was insufficient to support his convictions. The record indicates the trial court carefully weighed the evidence presented at trial against the entire record before determining the defendant was not entitled to a new trial. The defendant is not entitled to relief.

## *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE